IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-00560-RBJ

CORINNA LUJAN,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,
DEPARTMENTS OF CAREER SERVICE AUTHORITY (CSA), and
PUBLIC WORKS (PW),

      Defendants.

---

## ORDER

---

Plaintiff Corinna Lujan sues the City and County of Denver for discrimination and retaliation based on her race or national origin, Hispanic, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and 42 U.S.C. §§ 1981 and 1983.[1]  Before the Court is defendant's motion for summary judgment [docket #34] which, after briefing, was argued on March 27, 2013.  For the reasons set forth herein, the motion is granted, and the case is dismissed.

### FACTS

Ms. Lujan began working as an Executive Assistant I in the Engineering Capital Projects Management section of the Department of Public Works in February 2009.  She alleges that almost immediately she observed her supervisor, Therese Roberts, engaging in harassing and

---

[1] The complaint lists the Career Service Authority and the Department of Public Works as defendants, but they are subordinate departments of the City and County of Denver and are not appropriately listed as separate defendants.

bullying behavior, particularly towards minority employees.  Ms. Roberts also was in the habit of requesting loans from employees, including Ms. Lujan.

One of Ms. Lujan's primary responsibilities was to assist the Manager II/Director of Engineering in the Capital Projects Management section, Mitch Kumar.  Ms. Lujan alleges that she observed Mr. Kumar's supervisor, Lesley Thomas, engaging in harassing, discriminatory and bullying behaviors towards Mr. Kumar, who is of Indian descent.  Ms. Roberts and Ms. Thomas are Caucasians.  Their actions frustrated Ms. Lujan, but she did not complain at first.

In 2010 Ms. Lujan received an "Exceeds Expectations" rating for 2009, but she was told that she needed to spend less time assisting Mr. Kumar and to distance herself from him. However, she refused to participate in the misconduct directed at Mr. Kumar, and she continued to provide him with assistance.  She also refused a request from Ms. Roberts that she lend her $800.

On April 11, 2011 Ms. Lujan received her performance rating for 2010.  This time it was "Successful."  Under Career Service Rules [#34-9] an overall rating of "Successful" means that the employee "consistently achieved performance standards."  Rule 13-31.  Nevertheless, this was a lower rating than Ms. Lujan had received for 2009.  She was not happy with the rating, and said so during the April 11 meeting.  She says that Ms. Roberts put her on the spot during the April 11 meeting to convince her why she deserved a better rating, and that after she responded, Ms. Roberts committed to change the rating to "Exceeds Expectations."  Lujan Statement [#34-6] at 6.

Notwithstanding Ms. Roberts' alleged agreement to change the performance rating, Ms. Lujan decided to express concerns to Ms. Roberts' supervisor.  She met with the supervisor, Rob Duncanson, that same day for the first of what became a series of complaints about Ms. Roberts.

Internal Complaints

*Duncanson.* As indicated, on April 11, 2011, Ms. Lujan met with Mr. Duncanson. She told him that she had seen Ms. Roberts bully Cynthia Morales and Patti Abeyta, and that she believed Ms. Roberts was assisting Ms. Thomas in bullying Mr. Kumar. Lujan Deposition [#34-2] at 53-55. She expressed concern that Ms. Roberts might bully and harass her like she had Ms. Morales and Ms. Abeyta. When pressed for specifics, she mentioned that her performance rating had gone from "Outstanding" to "Below Expectations," which she could not understand (and which was not accurate). She also told Mr. Duncanson that Ms. Roberts had been asking her "and a lot of people" to borrow money, in large amounts at times, and that she had initially been afraid not to do it. However, she had declined Ms. Roberts' latest request which was for an $800 loan. *Id.* at 56-57.

Mr. Duncanson met with Ms. Roberts the following day and discussed some of the things that Ms. Lujan had reported. On April 15, 2011 Mr. Duncanson gave Ms. Roberts a verbal reprimand for soliciting loans from employees.

*Boyd.* On April 14, 2011 Ms. Lujan notified Nyle Boyd, Director of Human Services at the City and County of Denver's Career Service Authority, that she wished to make a complaint against Ms. Roberts. She met with Ms. Boyd on April 18, 2011 and expressed her concerns. She also expressed concerns that Roxanne Stuber, a supervisor in the Career Services Authority, was targeting Mr. Kumar and requested that Ms. Stuber not be involved in the investigation of her concerns. She filed a formal complaint with the Career Services Authority later, as discussed below.

*Grievance.* On May 3, 2011 Ms. Lujan filed a grievance against Ms. Roberts and Mr. Duncanson. [#34-8]. This was based on her belief that, during the April 11, 2011 performance

review, Ms. Roberts had agreed to change her rating for 2010.   The grievance complained that Ms. Roberts had not followed through on that agreement but does not assert that Ms. Roberts' conduct was based on race or national origin.   The grievance was denied on grounds that it was not timely filed.   Lujan Deposition [#34-2] at 8 (deposition page 72).[2]

*Board of Ethics.*   On June 10, 2011 Ms. Lujan filed a complaint against Ms. Roberts with the City and County of Denver's Board of Ethics concerning her borrowing and attempts to borrow money from Public Works employees.   On October 27, 2011 the Board issued written Findings and an Order.   [#34-5]   It found that Ms. Roberts borrowed or attempted to borrow money from at least 15 employees, five of whom were her supervisees, on numerous occasions between 2007 and 2011.   The amounts ranged from less than $20 to as much as $1,300.   Some employees declined to make some of the larger loans requested.   Ms. Roberts repaid the large loans but often did not repay the smaller ones.   The Board found that employees who were supervised by Ms. Roberts, including Ms. Lujan, felt intimidated and pressured by these requests.   *Id.* at 7.   The Board found that this conduct violated a Denver Code of Ethics regulation.   Although the conduct appeared to have ended following Mr. Duncanson's verbal reprimand, the Board found that this was not a sufficient response.   Accordingly, it recommended that a greater level of discipline be imposed because of the pattern of misconduct. *Id.* at 8.   The Board did not specify what that should be.   No additional discipline was imposed.

*Career Service Authority.*   On August 5, 2011, while the Board of Ethics complaint was pending, Ms. Lujan filed a formal complaint against Ms. Roberts with the Career Services Authority ("CSA"), which is Denver's human resources agency.   [#34-6].   This complaint was supported by a four-page statement detailing 12 categories of misconduct that she attributed to

---

[2] The grievance was deemed untimely under Career Service Rule 18(B)(2), requiring that the grievance be submitted within 15 days after notification of the action or inaction that gives rise to the grievance.   [#34-9] at 32.   Whether the rule was properly applied to this grievance is not an issue that the parties have presented or that the Court considers.

Ms. Roberts: (1) sending Ms. Lujan to bring her food; (2) asking her to report on Mr. Kumar's comings and goings; (3) mistreatment of a minority team member; (4) requests for loans (including a $550 loan that she had made to Ms. Roberts); (5) passing on a vicious rumor that Ms. Lujan's boyfriend, by whom she was seven months pregnant, was sleeping with a subordinate; (6) mistreating a minority team member who had replaced the minority team member whom she was mistreating before; (7) getting rid of the woman who replaced Ms. Lujan during her maternity leave, inappropriately; (8) retaliating against her after she declined to lend her $800; (9) reneging on a commitment to change Ms. Lujan's 2010 performance rating after Ms. Lujan reported Ms. Roberts' inappropriate behaviors to Mr. Duncanson; (10) more retaliation by Ms. Roberts after that; (11) an incident where Ms. Roberts gave her a mean look after, she suspected, Ms. Roberts had said something that caused a Caucasian employee to yell at Ms. Lujan; and (12) the denial of her grievance concerning the performance rating.

The CSA complaint was investigated by Jerome Cooper, a Human Resources Specialist, and Sherry Kerford, Associate Human Resources Professional.  In a lengthy report [#34-6 at 8-46] dated October 10, 2011 the authors explain that they interviewed 14 employees, including Ms. Lujan (twice), Mr. Duncanson, Ms. Morales, Mr. Kumar, and Ms. Roberts.  The investigators sustained some complaints.  For example, they found that Ms. Roberts inappropriately asked employees to bring food to her and sometimes took food and money from employees' desks without permission.  They rejected other complaints, including the complaints of discrimination, retaliation, and dishonesty about changing the performance rating.  They deferred to the pending Board of Ethics investigation on the complaint concerning loans.

With respect to Ms. Lujan's discrimination complaint the investigators only cited comments of Ms. Lujan, Ms. Morales (who supported the complaint) and Ms. Roberts (who did

not).  They did not interview Patti Abeyta or other Hispanic employees about this issue, so far as the report discloses.  *Id.* at 24-26, 34-35.  Ms. Stuber, whom Ms. Lujan had not wanted to be a participant in the investigation, has subsequently testified in her deposition [#37-9] that she does not believe that the investigators adequately responded to the complaint of discrimination.  *Id.* at 4 (deposition p. 128).

As for bullying and abusive behavior, the investigators cited the Career Service Authority's "zero tolerance" policy on such behavior but reported that they could not find evidence of bullying or abuse of authority without a definition of those terms.  *Id.* at 32.  They did find that Ms. Roberts had demonstrated bad management practice based on the manner in which she relates to many of her subordinates, *id.*, and as a sanction they recommended that Ms. Roberts be given a written reprimand.  One of the two investigators, Ms. Kerford, has acknowledged in her deposition [#37-7] that she thought Ms. Roberts should have been terminated because of her unethical conduct and borrowing money.  *Id.* at 3 (deposition p. 37).  She also felt that Ms. Roberts was a bully.  *Id.* (p. 40).  Apparently Mr. Cooper overruled her.  *Id.* (deposition p. 39).

Despite the recommendation for a written warning, no further discipline was imposed.  In its motion the City states that "Mr. Duncanson chose not to discipline Ms. Roberts three times for the same misconduct, especially since the verbal reprimand he gave Ms. Roberts had achieved the desired result."  Motion at 4.  This is not supported by a citation to anything in the record.

EEOC Complaint

On August 16, 2011, while the Board of Ethics and Career Services Authority complaints were pending, Ms. Lujan contacted the Equal Employment Opportunity Commission and

requested an appointment.  She was interviewed and filled out a questionnaire on August 22, 2011.  EEOC Records [#34-3] at 1-5.  The interviewer, Amy Wood-Ocana, told her that, based on the information Ms. Lujan had provided, the EEOC probably would issue her a right to sue letter.  *Id.* at 1.  This meant, as the EEOC later indicated, that the EEOC was not planning to investigate her complaints.

Nevertheless, her complaints were reduced to writing.  The investigator, Amy Wood-Ocana, sent Ms. Lujan an email on August 26, 2011 and apparently sent to Ms. Lujan on August 26, 2011 by email.  EEOC Records [#34-3] at 10.  It is not entirely clear what was mailed.  One document obtained by the defendant from the EEOC's files pursuant to a Freedom of Information Act request appears to be a draft of a "Charge of Discrimination."  *Id.* at 6-9.  It lists her complaints in some 20 numbered paragraphs, but there is no evidence that this draft, if it was a draft, was sent to Ms. Lujan.  The EEOC file also contains another "Charge of Discrimination" that appears to be a final version.  *Id.* at 24.  It lists, in summary form, five complaints.  It is marked with "x's" where Ms. Lujan was to sign and date it and then return it.

Another document obtained from the EEOC file is a form letter dated August 26, 2011 but stamped "RECEIVED Sep 20 2011 EEOC-Denver District Office.  *Id.* at 25.  This letter, also signed by Ms. Wood-Ocana, purports to have been sent to Ms. Lujan on August 26 with an attached EEOC Form 5 Charge of Discrimination.  Presumably the latter is a reference to the "final" Charge.  Whether it was sent by email or regular mail is unknown to me.  The form letter says that "[b]ecause the document that you submitted to us constitutes a charge of employment discrimination, we have complied with the law and notified the employer that you filed a charge."  *Id.*  The file contains no other evidence that Ms. Lujan's employer was in fact notified.

The document indicates that the EEOC must receive the signed Charge before it would initiate and investigation, and warned her that failure to return a signed Charge within 30 days could result in dismissal of the charge and issuance of a right to sue letter. *Id.* Ms. Lujan did not return the signed Charge within the 30 days. The EEOC's note log indicates that on September 26, 2011 Ms. Wood-Ocana left a message for Ms. Lujan inquiring whether she was still interested in pursuing the charge and indicating that if the signed charge were not received by October 3, 2011, they would consider the case to be closed. [#34-3 at 1].

On October 3, 2011 Ms. Lujan left a message indicting that she still intended to pursue the Charge.[3]  Ms. Wood-Ocana responded that Ms. Lujan could withdraw the complaint and file another one in the future if the incidents continued, and she reminded Ms. Lujan that, based on the information supplied so far, the EEOC probably would not investigate the Charge but would issue a right to sue letter. Ms. Lujan responded by email on October 11, 2011 that she still wanted to proceed but was hoping that the EEOC could request the findings of the CSA investigation (which had been issued the previous day, apparently unbeknownst to Ms. Lujan when she sent the email) before issuing the right to sue letter.

Ms. Lujan produced a copy of a signed final EEOC Charge as an exhibit to her response to the motion for summary judgment. [#37-6]. It is not dated, and there is no signed Charge in the EEOC's file. However, in the Amended Affidavit that was produced at the summary judgment hearing Ms. Lujan swears that she hand delivered her signed Charge to the EEOC sometime in October 2011 and left it with someone at the front desk.

---

[3] The document that confirms this message and the exchange that followed was not in the EEOC Records. At the summary judgment hearing plaintiff's counsel produced an "Amended Affidavit of Corinna Lujan," to which was attached a set of three emails starting with the August 26, 2011 email that is in the EEOC Records; Ms. Wood-Ocana's email of October 3, 2011; and Ms. Lujan's response email of October 11, 2011. Neither party has put that document in the record, so the Court will do so.

Regardless whether or when Ms. Lujan filed a signed Charge, the EEOC did issue a right to sue letter on December 6, 2011.

Subsequent Events

*Verbal reprimand.* On the same date, December 6, 2011 Ms. Roberts verbally reprimanded Ms. Lujan for being late to work on December 1 and 2, 2011 after being counseled for tardiness on May 18, 2011. Letter [#34-7] at 1-2.

*Second CSA complaint.* Still on December 6, 2011 Ms. Lujan filed a complaint with the Career Service Authority, alleging that Ms. Roberts was retaliating against her because of her previous Career Service Authority and her Board of Ethics complaints. [#34-5 at 1-4]. The record does not indicate the outcome of that complaint.

*Lawsuit.* On March 2, 2012 Ms. Lujan filed this lawsuit.

*Second grievance.* On March 13, 2012 Ms. Lujan filed a grievance against Ms. Roberts and Mr. Duncanson, stemming at least in part from her objection to her performance rating for 2011. [#34-8 at 8-12]. She complained that (1) Ms. Roberts had changed her 2011 PEP/PEPR performance review and weights associated with it without notifying her first;[4] (2) during a March 5, 2012 meeting Ms. Roberts, in Mr. Duncanson's presence, had made false statements about her; and (3) Ms. Roberts' discriminatory harassment and bullying had continued, and Mr. Duncanson had done nothing about it.

On March 28, 2012 George Delaney, Jr., then the Manager of the Department of Public Works, responded to the grievance. [#34-8 at 13-14]. He acknowledged that changes were made to the 2011 PEP for all Executive Assistants in her department to make the requirements more specific. This had been discussed with the team in May 2011, and Ms. Roberts indicated that she

---

[4] "PEP" stands for "Performance Enhancement Program." CSA Rule 13 [#34-9] at 2. "PEPR" stands for the PEP Report, which contains the performance rating. *Id.* at 3.

went over the changes with Ms. Lujan specifically on May 18, 2011.  Mr. Delaney indicated that Ms. Lujan's performance rating took into consideration information from Mr. Kumar, Survey Monkey 360 data, a list of her 2011 accomplishments, and the observations of her supervisor (Ms. Roberts) and were found to be reasonable.

Mr. Delaney further indicated that he had found no indication that Ms. Roberts had treated her differently from others in the team, except for specific improvements she needed to make, and that there was no evidence to support her allegations of discrimination, harassment or bullying.  Accordingly he recommended that her performance rating for 2011 stand.

*Employee of the Year.*  In April 2012 Ms. Lujan was voted by her peers to be the Employee of the Year for 2011 in the Capital Projects Management section.  [#37-2].

*Informal complaints.*  Ms. Lujan surreptitiously recorded as many as 19 conversations she had with various City employees, supervisors and managers, including a meeting with Mayor Hancock.  This is supported by Ms. Lujan's interrogatory answers [#34-1] at 2; a list of recordings she provided during discovery; and deposition testimony [#34-2] at 4 (deposition p. 41), and at 10-12 (deposition pp. 121-128, 133).

*Transfer.*  In September 2012 Ms. Lujan obtained a lateral transfer to a work location closer to her home.  Lujan Deposition [#34-2] at 139.  She is saving $1,700 a month on parking. *Id.* at 140.  She likes her job duties in the new position, *id.* at 142-43, and according to the head of the Public Works department, Jose Cornejo, she is doing very well in the new position. Cornejo Deposition [#37-5] at 47.[5]  Perhaps best of all, she is no longer under the thumb of Therese Roberts.

---

[5] The Cornejo deposition is apparently misdated January 23, 2012.  Mr. Cornejo had not yet been appointed Director the Department and Ms. Lujan had not yet been transferred in January 2012.

## CONCLUSIONS

I. **TITLE VII**.

    A. **Exhaustion of Administrative Remedies.**

        A Title VII plaintiff must exhaust her administrative remedies before filing a lawsuit.  To do so she must file a timely charge with the EEOC (or a corresponding state agency) and receive notice of the right to sue.  *Simms v. Oklahoma ex rel. Department of Mental Health*, 165 F.3d 1321, 1326 (10th Cir. 1999).  This implies that the EEOC will have a reasonable opportunity to investigate the claim and to determine whether to pursue it or to grant the claimant the right to sue.  *See Jones v. U.P.S.*, 502 F.3d 1176, 1186 (10th Cir. 2007).

        A plaintiff must exhaust her administrative remedies as to each discrete incident of improper treatment of which she complains.  *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003).  "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Id.*  With the possible exception of a hostile work environment claim, a complainant must exhaust whether the act occurred before she files the EEOC complaint, or after that complaint but before she files a lawsuit, or after the lawsuit is filed.  *Id.* at 1210-11.[6]  This requirement likewise applies to acts occurring in connection with the lawsuit itself.  *McDonald-Cuba v. Santa Fe Protective Services, Inc.*, 644 F.3d 1096, 1101 (10th Cir. 2011).

        There is a fact dispute as to whether Ms. Lujan filed a signed Charge of Discrimination with the EEOC.  The Court cannot resolve that dispute without testimony from Ms. Lujan and probably from an appropriate EEOC employee, which would better permit the Court to make a

---

[6] Ms. Lujan initially did assert a hostile work environment claim, but during discovery she advised that she was no longer pursuing that claim.

credibility determination. For purposes of the pending motion, however, the Court will assume

that she did file the Charge, and that she did so as she has indicated sometime in October 2011.[7]

**B. Adverse Action.**

1. Discrimination Claim.

In order to make out a prima facie case of discrimination under Title VII plaintiff must

first establish "(1) membership in a protected class, (2) adverse employment action, and (3)

disparate treatment among similarly situated employees." *Orr v. City of Albuquerque*, 417 F.3d

1144, 1149 (10th Cir. 2005). In addition, to establish the liability of the defendant here, she must

establish "that the City's officials acted pursuant to a 'custom or policy' of 'discriminatory

employment practices.'" *Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (10th Cir.

2008). To defeat a motion for summary judgment plaintiff must come forward with evidence

that shows that there is a genuine dispute of material fact concerning whether those requirements

can be met.

It is undisputed that Ms. Lujan, a Hispanic female, is a member of a protected class. I

will assume that there is a genuine dispute of material fact concerning the disparate treatment

element. Defendant's argument is that it is beyond genuine dispute that Ms. Lujan did not suffer

an adverse employment action and therefore cannot establish the second element of a prima facie

discrimination claim. I agree.

An adverse employment action must have some significantly adverse impact on the

employee's employment status. "Although we will liberally construe the phrase adverse

employment action, the action must amount to a significant change in employment status, such

---

[7] The EEOC made it clear from the date of her initial interview that it probably would not investigate her claims, and it did not wait 180 days before issuing the right to sue letter. Whether that was because the EEOC was not impressed with Ms. Lujan's claim or because the EEOC decided it was too busy or for some other reason is unknown to the Court. In any event, while a plaintiff is never excused from exhausting her administrative remedies, the EEOC provided no meaningful remedy to Ms. Lujan in this instance.

as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . causing a significant change in benefits.  Mere inconveniences or alterations of job responsibilities do not rise to the level of an adverse employment action." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (decided in the retaliation context) (internal citations and quotation marks omitted).

Ms. Lewis was not fired.  She was not, so far as the record shows, denied a promotion. There was no change in her benefits.  She did receive a verbal reprimand on December 6, 2011 for being tardy on two previous occasions.  However, a reprimand generally is not an adverse employment action.  *Lewis v. Denver Fire Department*, No. 09CV0004, 2013 WL 24279, at *3 (D. Colo. Jan. 2, 2013).

In any event, Ms. Lujan did not exhaust her administrative remedies as to this verbal reprimand or as to the subsequent written reprimand.  In her response to the motion for summary judgment, plaintiff identified "increased workload" as the adverse employment action.  In plaintiff's response she states that in November 2011 Ms. Abeyta transferred out of the Capital Projects Management group to get away from Ms. Roberts.  One of her duties had been processing pay applications submitted by contractors.  Ms. Roberts then assigned that duty to Ms. Lujan without eliminating other duties.  Ms. Abeyta has provided an affidavit [#37-8] in which she estimates that pay applications took her approximately one hour a day or five hours per week.  *Id.* at 3, ¶16.  Ms. Roberts testified that today she does the pay applications herself and that it takes her "at the very, very, very most, two hours a week."  Roberts Deposition [#37-4] at 3, deposition page 26.[8]

---

[8] In her response brief plaintiff suggests that a city document suggests that pay applications take 40 percent of the employee's full time responsibilities, which would amount to 16 hours a week.  [#37 at 6, n.5].  She cites Exh. 3 at p. 35, 1-19.  Her exhibit 3 is a job description for the Executive Assistant I CPM position, but it does not contain the

In the first place, if as plaintiff states this increase in her workload occurred in November 2011 (and this is supported by the Abeyta affidavit), she could not have exhausted her administrative remedies as to this increase in workload.  By her own statement she filed her signed EEOC Charge sometime in October.  Moreover, the Charge filed in October simply reflected the complaints she brought to the EEOC on August 22, 2011.  She never updated her August 22, 2011 list of complaints.

I note that, according to the draft EEOC charge [#34-3], one of Ms. Lujan's complaints was:

> 19.  Ms. Roberts doesn't provide necessary communication with me that will affect my job duties and expectations.  Ms. Roberts reassigned another team member's (only other minority) job assignments and told this person to give me back certain duties.  Ms. Roberts never discussed this with me.  Ms. Roberts was recently out of the office for over three weeks and never communicated that she was going to be out of the office with me.  She did inform her Caucasian subordinates.  I had to find out from an out of office reply.

*Id.* at 9.

Since this list of complaints was provided to the EEOC in August 2011, it must not refer to the transfer of the pay applications duties from Ms. Abeyta, which Ms. Lujan and Ms. Abeyta say took place in November.  Whatever paragraph 19 of the draft complaint references, however, her issue does not appear to be the burden of an increased workload.  Rather, her concern appears to focus on Ms. Roberts' lack of communication with her.

Even apart from the exhaustion issue, the reassignment of Ms. Abeyta's pay applications duties does not amount to an adverse employment action.  The Tenth Circuit has indicated that an increased workload could be an adverse employment action in some circumstances.  *Jones v. Barnhart*, 349 F.3d 1260, 1265 (10th Cir. 2003).  Here, however, the additional duties consumed a small amount of Ms. Lujan's overall work week.  She has not indicated that she could not

page or the information represented.  In any event, there is no evidence that pay applications actually took anything near 16 hours a week.

handle the additional work, or that other employees in the department did not have equally large workloads, or that only minority employees were overburdened with work.  Frankly, it appears to this Court that plaintiff is in search of an adverse employment action and settled upon the pay application duties as "any port in a storm."

Throughout her series of internal complaints, and also in her EEOC complaint, albeit not in her response to the motion for summary judgment, Ms. Lujan emphasized the fact that in early 2011 she received a "Successful" performance evaluation for 2010, a downgrade from the "Exceeds Expectations" rating she received for 2009.  However, a lower performance rating, by itself, is not an adverse employment action.  *Cf. Stover*, 382 F.3d at 1075 ("simply because an employee receives an evaluation lower than previous evaluations, the lower evaluation cannot be assumed to be a negative evaluation for the purposes of a retaliation claim").  Moreover, while no one wishes to receive a lower rating, "Successful" does mean "consistently achieved performance standards."

In *Stover* the court allowed that "[t]here may be circumstances where inconveniences, alterations of job responsibilities, lower performance reviews, and insufficient recognition for outstanding work individually are insufficient to demonstrate an adverse employment action, yet when considered together, amount to an adverse employment action."  382 F.3d at 1075. However, on facts somewhat similar to those in the present case—plaintiff was moved to an isolated office, did not receive work commensurate with her experience, was not offered a higher position or given deserved recognition, received a "highly successful" as opposed to an "outstanding" performance appraisal—the *Stover* court concluded that the collective circumstances were insufficient to amount to an adverse employment action.

This Court reaches the same conclusion here.  There is ample evidence that Ms. Lujan was the victim of bullying and other misconduct by her immediate supervisor, Ms. Roberts. Some of it occurred before August 22, 2011 when she was interviewed by the EEOC, and to that extent, she can be said to have exhausted her administrative remedy.  However, while Ms. Roberts' conduct may well have made many of Ms. Lujan's workdays unpleasant, the Court cannot find that Ms. Roberts' actions, singly or in combination, amounted to the type of "adverse employment action" that would support a Title VII claim.  Therefore, because Ms. Lujan has not presented facts that create a genuine dispute of fact as to whether she suffered an adverse employment action, her Title VII discrimination claim must be dismissed.

2.  <u>Retaliation</u>.

The elements of a prima facie retaliation claim are that (1) the plaintiff engaged in protected activity; (2) the employer took an adverse action that a reasonable employee would have found to be materially adverse, and (3) there is a causal connection between the protected activity and the employer's action.  *See Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008); *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Once again, to attach liability to the City and County of Denver, it must also be shown that the wrongful acts of City officials were done pursuant to a municipal custom or policy.  *Carney*, 534 F.3d at 1273.

*Protected activity*. Protected activity is either <u>participation</u> in an investigation, proceeding, or hearing under Title VII, or <u>opposition</u> to a practice made an unlawful employment practice by Title VII.  *Vaughn*, 537 F.3d at 1151.

Ms. Lujan participated in an EEOC proceeding when she was interviewed by the EEOC on August 22, 2011 and later, I have assumed, filed an EEOC Charge of Discrimination in

October 2011.  The EEOC supposedly notified her employer that she filed a charge.  If thereafter she had been the victim of a materially adverse action in retaliation for her having contacted the EEOC, and if she exhausted her administrative remedies as to the retaliatory action, then she would have a potentially viable Title VII claim.  However, Ms. Lujan did not complain to the EEOC after August 22, 2011 about any act of retaliation (or discrimination).  Her only complaint to the EEOC was her interview on that date.  Therefore, she has no retaliation claim based on her participating in the EEOC proceeding.  This is not a "participation" case.

She did complain to the EEOC about retaliation against her "opposition" to Ms. Roberts' conduct, which arguably exhausted her administrative remedies as to retaliation for protected activity in which she had engaged before August 22, 2011.  Therefore, I look at what actions she brought to the EEOC's attention that arguably could be deemed as engaging in protected activity. I can identify three possibilities: (1) her complaint to Mr. Duncanson on April 11, 2011, listed in the draft EEOC Charge in paragraph 11; (2) an April 14, 2011 email to and April 18 meeting with Nyle Boyd, the Human Resources Director, concerning a complaint she was going to file, listed at paragraph 12 of the draft EEOC Charge; and (3) her May 3, 2011 grievance, listed at paragraph 13 of the draft EEOC charge.  [#34-3 at 7].  I note that she did not, so far as the EEOC paperwork indicates, mention her filing of the Board of Ethics complaint on June 10, 2011 or the formal CSA complaint on August 5, 2011.

*Adverse action.*  Adverse action for purposes of a retaliation claim need not be an "adverse employment action" as that phrase has been construed in Title VII discrimination cases. *Somoza v. University of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008).  However the employer's action must be materially adverse "in order to separate trivial harms from actionable injuries because Title VII does not establish 'a general civility code for the American workplace.'" *Id.*

17

(quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  It is an objective standard, namely, would a reasonable employee have been dissuaded from making the charge of discrimination if she had known that the employer would take the challenged action in response. *Id.*  However, "the fact that the employee continues to be undeterred in his or her pursuit of a remedy . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable." *Id.* at 1214.

The draft EEOC Charge indicates that on the day after Ms. Lujan's meeting with Mr. Duncanson, he met with Ms. Roberts and informed her of some of Ms. Lujan's complaints. [#34-3 at 8].  Ms. Roberts retaliated by reneging on her commitment to change Ms. Lujan's 2010 performance rating.  There is a fact dispute as to whether Ms. Roberts had agreed to change the performance rating.  Ms. Lujan, who had surreptitiously recorded her April 11 meeting with Ms. Roberts, registered the same complaint with the CSA.  The CSA investigators did not interpret the recording as confirming an agreement to change the rating.  [#34-6 at 16].  In any event, as indicated above, a lowered performance evaluation cannot be assumed to be a negative evaluation for the purposes of a retaliation claim.  *Stover*, 382 F.3d at 1075.  Similarly here, I do not consider a refusal to change a rating from "Successful" to "Exceeds Expectations" to be a materially adverse action, i.e., an action that would dissuade a reasonable employee from complaining to Mr. Duncanson about the loans and the other complaints she voiced to him.

There is no indication in the draft or final EEOC Charge, or elsewhere in the record for that matter, that Ms. Lujan perceived that there was retaliation against her for contacting Ms. Boyd on April 14 and April 18, 2011 and voicing her complaints about Ms. Roberts to her.

Ms. Lujan did report to the EEOC that she believed she there was retaliation for her having filed a grievance on May 3, 2011.  The Draft Charge states, "Ever Since [sic] I filed my

grievance, Ms. Roberts has increased her discriminatory retaliation intensity by being dishonest and attempting to write me up excessively.  As excessive as requesting HR support to write me up for three different things on May 19, 2011.  She was unsuccessful in those attempts.  Ms. Roberts confided in another one of her subordinates that she was advised to lay off of me completely because of retaliation." *Id.* ¶16.  As Ms. Lujan herself recognized, Ms. Roberts' efforts to have HR to write her up did not succeed.  On the contrary, she apparently was told to lay off Ms. Lujan.  This is not evidence of a materially adverse action.

Finally, I note that Ms. Lujan was not dissuaded by Ms. Roberts' retaliation from continuing to make complaints about her.  The record demonstrates that she was persistent in registering complaints until she finally was able to secure a transfer away from Ms. Roberts. This, as the Tenth Circuit indicated in *Somoza*, sheds some light on "whether the actions are sufficiently material and adverse to be actionable."  513 F.3d at 1214.  The City in its motion portrays Ms. Lujan as a continual complainer.  If Ms. Roberts treated her and others as Ms. Lujan alleges, I can understand and appreciate her refusal to knuckle under.  I cannot, however, conclude that Ms. Lujan has provided evidence of retaliation, as to which she exhausted her administrative remedies, that would support a Title VII claim.

## II.   SECTIONS 1981 AND 1983.

The elements of a § 1981/1983 claim are similar to those of a Title VII claim.  "To establish a prima facie case, [Ms. Lujan] must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."  *Carney*, 534 F.3d 1269, 1273 (10th Cir. 2008) (citation and internal quotation marks omitted).  In addition, in order to establish the City's liability, plaintiff must also show

that the City's officials acted pursuant to a custom or policy of discriminatory employment practices. *Id.*

Unlike a Title VII claim, there is no requirement that Ms. Lujan exhaust administrative remedies in order to pursue her §§ 1981 and 1983 claims. This opens the record up to all allegedly discriminatory or retaliatory acts that occurred during the course of her employment. However, for much the same reasons as were discussed above, the Court cannot find that she suffered from an adverse action that would support either discrimination or a retaliation claim. She was never fired, demoted, denied a promotion, had her benefits reduced, transferred (against her will) or otherwise disciplined in any material way. She received two reprimands, one verbal and the other written, for tardiness. She does not deny that she was late to work on the days involved, nor in any event, as discussed above, are reprimands considered to be materially adverse actions that would support a discrimination or a retaliation claim. She received a lower performance rating than she wanted and felt that she deserved for 2010 and 2011. However, her "Successful" rating indicating that she had "consistently achieved performance standards," and it too would not be considered to be an adverse action that would support a discrimination or retaliation claim.

At bottom, she has two basic complaints. First, she was treated rudely and inappropriately by her immediate supervisor, Therese Roberts. Second, City officials did not do enough to support her when she complained about Ms. Roberts. I am inclined to agree with both complaints but still do not conclude that she has an actionable claim.

Ms. Roberts made Ms. Lujan's work life miserable at times. Plaintiff's evidence does make her out to be a bully. Perhaps she also harbors a discriminatory bias, as might be indicated by the fact that she is alleged to have treated Ms. Lujan, Ms. Morales, Ms. Abeyta and Mr.

Kumar poorly.  She also treated other subordinate employees inappropriately, such as by hitting them up for loans, some of which she apparently did not even repay, and by taking food and money from their desks.  Despite the unpleasantness of this conduct, however, Ms. Lujan not only suffered no significantly adverse employment action, but she was voted Employee of the Year and was ultimately transferred, at her request, to a new position where she receives the same compensation and benefits, saves $1,700 a month in parking costs, is closer to her home, and is doing very well according to the current Director of the Public Works Department.

As for the City's response to her complaints, Mr. Duncanson did respond to Ms. Lujan's complaint and verbally reprimanded Ms. Roberts for soliciting loans from subordinate employees.  Apparently the behavior stopped.  That response, as far as it went, was reasonable.

The Board of Ethics responded fully to Ms. Lujan's complaint about the loans, and it recommended additional discipline.  However, no additional discipline was imposed.  I have difficulty understanding why that recommendation was not followed.  The suggested explanation, that Mr. Duncanson did not think it to be necessary to discipline Ms. Roberts three times for the same conduct, is not only an assertion by counsel but an unsatisfactory excuse.  The Board of Ethics' recommendation at a minimum deserved the attention of the top officials in the Department of Public Works.  There is no indication in the record before me that it received that level of attention.

The CSA investigators conducted an investigation of the broad array of Ms. Lujan's complaints about Ms. Roberts.  In this Court's view, the investigation and report were mediocre, at best.  So far as the report discloses, the investigators did not dig in and truly explore the complaints, especially the discrimination and retaliation complaints.  The belief of one of the two investigators that Ms. Roberts should have been terminated was not reflected in the report, much

less implemented.  The report does recommend a written reprimand, but that recommendation apparently fell on deaf ears.  Whether it was considered by the senior policymakers in the Department of Public Works is unknown to me.

In my view, the City has no cause to be proud of the quality of its response to what appear to the Court to have been legitimate complaints.  If the Court needed to resolve the municipal liability issue, it would find that there is a genuine dispute of material fact as to whether the response to Ms. Lujan's complaints about the conduct of Ms. Roberts, which included complaints of discrimination against her on the basis of her minority status, was consistent with a custom and practice of the senior officials and policymakers within the Department of Public Works at the time of the investigations.

However, because Ms. Roberts has not come forward with evidence that she suffered either an adverse employment action or an action that would probably dissuade a reasonable employee from complaining about conduct such as that which she attributes to Ms. Roberts, the Court finds that there is no basis for a trial on her §§ 1981 or 1983 claims, just as there was no basis for a trial on her Title VII claims.

## III.   <u>STATE LAW CLAIMS.</u>

In addition to her Title VII and §§ 1981/1983 claims, Ms. Lujan asserts that the City's policies indicating that it will not tolerate discrimination, harassment or bullying gave her common law causes of action for breach of an implied contract and promissory estoppel. Because, in light of this Court's order there is no longer any federal question, the Court declines to exercise continuing supplemental jurisdiction.  *See* 28 U.S.C. § 1367(c)(3).  There likewise is no basis for federal jurisdiction over these claims based upon diversity of citizenship.

## ORDER

For the reasons set forth above, motion #34 is granted.  The Court directs that final judgment enter in favor of the City and County of Denver.  The federal claims asserted under Title VII and 42 U.S.C. §§ 1981 and 1983 are dismissed with prejudice.  The state law claims are dismissed without prejudice.

DATED this 2nd day of April, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge